## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAWN E. HEGYES,                          )
                                         )
       Plaintiff,                       )
                                         )
    v.                                  )         **2:04cv1283**
                                         )         **Electronic Filing**
UNITED STATES STEEL                      )
CORPORATION, aka USS Irvin Plant,        )
                                         )
       Defendant.                       )


## OPINION

CERCONE, D.J.

      Plaintiff commenced this Title VII action seeking redress for having to endure sexual

harassment in the workplace.  She alleges she was subjected to both discriminatory treatment and

retaliation.  Presently before the court is defendant's motion for summary judgment.  For the

reasons set forth below, the motion will be granted.

      Federal Rule of Civil Procedure 56 (c) provides that summary judgment may be granted

if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers

to interrogatories and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and the movant is entitled to judgment as a matter of law."

Summary judgment may be granted against a party who fails to adduce facts sufficient to

establish the existence of any element essential to that party's claim, and upon which that party

will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving

party bears the initial burden of identifying evidence which demonstrates the absence of a

genuine issue of material fact.  When the movant does not bear the burden of proof on the claim,

the movant's initial burden may be met by demonstrating the lack of record evidence to support

the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d

Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts

showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

Plaintiff contends her work environment was impermissibly hostile and she was subjected to frequent, severe and unreasonable harassment attributable to her gender. Specifically, she asserts the harassment began when a co-worker exposed himself by urinating in and around her work site. Plaintiff repeatedly informed her managers of his behavior. Plaintiff was the only individual that could see the co-worker engaging in this behavior. Despite defendant being informed of the behavior, nothing was done. Plaintiff continued to complain about the behavior periodically over a period of months.

2

In October of 2001, a vicing foreman witnessed the co-worker urinating on a dirt floor near his work station. Thereafter, plaintiff reported repeated incidents of improper urination by the co-worker to her shift foreman. On October 17, 2001, a member of defendant's upper management within the department was advised that workers were refusing to perform scheduled maintenance because the work site was contaminated with urine. On that same date, plaintiff reported the co-worker's behavior to defendant's head of industrial hygiene at the plant. The co-worker was suspended on that date, subject to discharge. He was discharged on October 22, 2001. His discharge was upheld in the grievance and arbitration proceedings that followed.

Thereafter, plaintiff transferred to a new department where she came under the supervision of different managers and supervisors. Eleven months later plaintiff filed a grievance along with a male co-worker claiming that each had been constantly harassed by management, which harassment consisted of yelling, swearing and uninformed accusations concerning work performance. Plaintiff explained that her immediate manager often cursed, pointed a finger in her face and yelled and screamed at her. Plaintiff and the male co-worker also filed a grievance protesting that they had been "forced and scheduled" to work overtime. The grievances were denied and the union did not take the matter to arbitration.

On October 8, 2002, plaintiff filed a grievance protesting a lack of restroom facilities for females in her immediate work area. Plaintiff had been questioned by her supervisors concerning long restroom breaks. Thereafter, plaintiff was questioned about her restroom usage by her ultimate supervisor every other day for two months. Plaintiff was questioned to the point where she had to give intimate details, which she found to be intimidating and humiliating.

During this same period of time plaintiff was directed to cut her lunch breaks short and return to her job site on two or three occasions. On one of those occasions plaintiff was forced to return to work while other males were permitted to remain on break.

Finally, in December of 2003 plaintiff had her pay docked on four occasions for a total of 3.6 hours due to tardiness in reporting to her work area. On at least on one of those occasions

3

plaintiff complained and the foreman reversed the entry, resulting in an adjustment to plaintiff's pay. On the other occasions plaintiff contends she was held to a higher standard than her male co-workers.

Plaintiff filed a charge of sexual discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on April 8, 2003. Plaintiff alleged that between August 29, 2002, and September 16, 2002, she had been subjected to both sexual discrimination and retaliation as a result of complaints made to management in October of 2001 concerning the behavior of a co-worker and a grievance she filed relating to a written warning received on August 29, 2002. Specifically, plaintiff alleged that the discrimination and retaliation consisted of being yelled at and having fingers pointed in her face by management, having her breaks cut short, being denied immediate access to a restroom facility in her work area and being disciplined for unsatisfactory work performance. Plaintiff indicated she had received a disciplinary slip for taking too long a lunch break and for being sick in the restroom. She alleged that male co-workers were not subjected to cursing, yelling and finger pointing.

On September 18, 2003, the EEOC issued a letter indicating that its investigation had failed to support plaintiff's allegations and that further investigation would not likely result in a finding of reasonable cause to believe that Title VII had been violated. Plaintiff was given an opportunity to come forward with additional information. Plaintiff provided information on September 26, 2003, and again in January of 2004. The January 2004 submission alleged that further discriminatory acts had occurred when plaintiff's pay had been docked in December of 2003 and asserted that the employment action was an ongoing form of harassment. The EEOC provided plaintiff with a right to sue letter on May 7, 2004.

Defendant contends that the events in 2001 were untimely under plaintiff's April 8, 2003, charge filed with the EEOC and her complaints concerning alleged different and higher standards regarding clock usage were never properly presented to that agency. In addition, defendant contends that plaintiff has failed to identify any conduct that was timely filed under the

4

Pennsylvania Human Relations Act ("PHRA").

Substantively, defendant contends that even if plaintiff's claims are considered timely, she nevertheless has failed to present sufficient evidence to support a hostile work environment claim. Specifically, defendant argues that plaintiff has failed to identify conduct that amounts to actionable sexual harassment. In addition, defendant contends that plaintiff did not suffer any tangible employment action and as a result it is entitled to rely on the affirmative defense of reasonable care, which plaintiff assertedly cannot rebut.

Plaintiff contends that the identified course of conduct constitutes a continuing form of sexual harassment and therefore the events in 2001 properly are considered as part of her harassment claim. In addition, the EEOC was provided with the ability to investigate the December 2003 incidents involving clock usage and therefore all aspects of her harassment claim properly are before the court. Substantively, plaintiff maintains that she was subject to frequent harassment that was severe and humiliating to a degree that unreasonably interfered with her job performance. Defendant's failure to address or correct the ongoing harassment was sufficient enough to constitute a tangible employment action and she took sufficient reasonable steps under defendant's harassment policy to preclude reliance on the reasonable care defense as a matter of law. Consequently, plaintiff maintains that material issues of fact remain for trial.

Plaintiff may use the evidence pertaining to her complaints concerning a co-worker urinating at his work site for a number of months in 2001 in support of her hostile work environment claims. Plaintiff presents her evidence as a series of separate acts that collectively constitute a single unlawful employment practice in the form of an actionable hostile work environment claim comprised of sexual discrimination and retaliation. In this context, plaintiff may introduce the evidence in question in an effort to prove the unlawfulness of the cumulative effect of the entire series of acts comprising her hostile work environment claim.

In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court illuminated Title VII's concept of "an unlawful employment practice" as it relates to

5

discrete discriminatory acts and hostile work environments and the timeliness of Title VII claims. A discrete discriminatory act, such as termination, failure to promote, denial of transfer, refusal to hire and so forth, constitutes a separate actionable "unlawful employment practice" and a charge challenging any such practice must be filed with the EEOC within one hundred eighty or three hundred days after the particular unlawful practice has occurred. Id. at 110. Timely filing a charge on a discrete act of discrimination does not make timely other discrete acts that occurred outside the time period, even if the untimely acts are related to the conduct giving rise to the timely filed charge. Id. at 111-12. In other words, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges [and] each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. at 113. The converse is equally true. "The existence of past acts and the employee's prior knowledge of their occurrence, ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." Id. Nor is an employee barred "from using the prior acts as background evidence in support of a timely claim." Id.

"Hostile environment claims are different in kind." Id. at 115. They are based on the cumulative effect of individual acts or repeated conduct, any one of which may not be actionable on its own. Id. It is the cumulative effect of such acts over a period of time, perhaps even years, that elevates the series of acts to the level of an "unlawful employment practice." Id. at 115-17. Thus, it does not matter that some of the component acts of a hostile work environment claim are outside the statutory time period because it is the cumulative effect of the entire series of acts that collectively constitute the "unlawful employment practice." Id. at 117. In other words, where "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." Id. at 117. And the fact that an employer has engaged in sufficient activity to make out an actionable hostile environment claim does not preclude the employee from demonstrating that an

unlawful employment practice is ongoing and continues to occur. Id. "Subsequent events ... may still be part of one hostile work environment claim and a charge may be filed at a later date and still encompass the whole." Id.

Plaintiff does not seek to recover for the events in 2001on the grounds that they constitute a discrete discriminatory act. Nor is there any basis in the record to construe that aspect of plaintiff's harassment claim in such a manner. She merely seeks to prove that she complained about a course of conduct by a co-worker and defendant failed to respond to those complaints in a timely manner. Plaintiff further seeks to prove that her complaints ultimately led to subsequent harassment and desperate treatment in her work environment. Under these circumstances, the events of 2001 are merely being referenced as background evidence in support of a claim based on the cumulative effect of the entire series of events brought into question by plaintiff's complaint alleging a single unlawful employment practice. Because the events underlying plaintiff's complaints of harassment and discipline in the fall of 2002 were clearly filed in a timely manner, the entire period of any hostile environment may be considered for the purposes of determining liability. Morgan, 536 U.S. at 117. Defendant's timeliness attack on plaintiff's evidence surrounding clock usage fails for similar reasons. Plaintiff raised these events as part of an ongoing environment of harassment. The EEOC received notice of the events through a letter from plaintiff's counsel dated January 5, 2004. The EEOC did not formerly relinquish jurisdiction over plaintiff's charge until May 7, 2004, and thus had an adequate opportunity to augment its investigation into plaintiff's claim of workplace harassment. Thus, plaintiff's allegations of improper clock usage were advanced as further evidence of the alleged unlawful employment practice raised in plaintiffs charge and the EEOC had an opportunity to consider the impact of the subsequent evidence on that charge. See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) ("the relevant test in determining whether appellant was required to exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.")

(quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984)); Anjelino v. New York Times, Co., 200 F.3d 73, 93 (3d Cir. 1999) ("the 'parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission.'") (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir. 1976)).

In contrast, plaintiff's hostile work environment claim pursuant to the Pennsylvania Human Relations Act set forth in Count III is beyond the purview of the court because plaintiff failed to exhaust her administrative remedies. "To bring suit under the PHRA, a plaintiff must have filed an administrative complaint with the PHRC within one hundred eighty days of the alleged act of discrimination." Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997), cert. denied, 522 U.S. 914 (1997). This requirement has been strictly interpreted by the Pennsylvania Courts and the plaintiff must utilize the administrative process of the Commission to be able to invoke the judicial remedies authorized by the PHRA. Id. (collecting cases in support); see also Sharp v. BW/IP Intern., Inc., 991 F. Supp.2d 451, 457 (E.D. Pa. 1998) (same).

Plaintiff filed her formal charge of discrimination with the EEOC on April 8, 2003. That charge identified discriminatory acts occurring in August and September of 2002. Plaintiff did not contact the PHRC within one hundred eighty days of the alleged discriminatory conduct identified in her EEOC charge and thus the PHRC never received a timely complaint regarding the core conduct forming plaintiff's hostile work environment claim. Consequently, defendant is entitled to summary judgment on plaintiff's PHRA claim at Count III. See Woodson, 109 F.3d at 925 ("If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA."); Clay v. Advanced Computer Applications, 559 A.2d 917, 919 (Pa. 1989) (same).

Defendant is entitled to summary judgment on the remaining counts of the complaint because the evidence of record is insufficient to support affirmative findings on at least two of

8

the elements of a hostile work environment claim. Specifically, plaintiff's evidence is insufficient to support a finding (1) that she suffered intentional discrimination because of her sex or (2) that such discrimination permeated the work place to the point where it altered the conditions of plaintiff's employment and created an abusive working environment.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... gender." 42 U.S.C. § 2000 e-2 (a) (1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [minority and non-minority employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).[1] "Title VII is violated 'when the workplace is permeated with discriminatory [gender-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Employees are entitled to protection from "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

Specifically, a prima facia case of a hostile work environment has the following elements: (1) the employee suffered intentional discrimination because of his or her gender; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the

---

[1]"[T]he elements and burden of proof that a Title VII plaintiff must meet are the same for racially charged harassment as for sexually charged harassment." Harrison v. Metropolitan Gov't. of Nashville and Davidson County, 80 F.3d 1107, 1118 (6th Cir.), cert. denied, 519 U.S. 863 (1967); see also Torres v. Pisano, 116 F.3d 625, 630 (2d Cir. 1997) (same); Morgan, 536 U.S. at 116 n. 10.

plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same gender in that position; and (5) the existence of <u>respondeat superior</u> liability. <u>Abramson v. William Paterson College of New Jersey</u>, 260 F.3d 265, 276-77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. <u>Id</u>. at 280-281.

In analyzing whether a plaintiff has established a prima facia case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." <u>Id</u>. at 276 (citing <u>Woodson</u>, 109 F.3d at 921). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." <u>Id</u>. (quoting <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1484 (3d Cir. 1990)).

Defendant contends that plaintiff has failed to produce any evidence to establish the first element, <u>i.e.</u> that she suffered intentional discrimination because of her sex. It asserts that when each incident underlying plaintiff's complaint is examined in context and considered in conjunction with the remaining evidence, the record fails to reflect any evidence of discriminatory treatment based on sex. It further contends that prompt remedial action was available to remedy the unlawful conduct identified by plaintiff, and she failed to take advantage of the reporting procedures available to her under defendant's anti-harassment policy. Thus, it asserts that plaintiff's evidence falls short of demonstrating the presence of sexually-based animus. We agree.

It is well-settled that a plaintiff need not produce direct evidence of an actor's motivation for conduct that can be found to be discrimination. <u>Abramson</u>, 260 F.3d at 278. In this regard it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. <u>Id</u>. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as

showing that [the plaintiff's] treatment was attributable to her [sex]." Id. at 277. In this context a plaintiff is not "required ... to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Id. at 278. Instead, the intent to discriminate can be inferred from the entire context in question and the conduct of the actors involved. Thus, "[r]egardless of what a harasser's intention is, if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her 'work-place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and the conduct is based on one of the categories protected under Title VII, a hostile work environment claim will survive summary judgment." Id. at 278-79. In other words, "where ... the evidence tends to show that the harasser's conduct was intentionally directed toward the plaintiff because of her [gender], the first prong of the prima facia case is met." Id. at 279.

In applying the above standards, the court agrees with plaintiff's contention that she is not required to demonstrate that the incidents forming the basis of her complaint have a direct link to or create an inference of conduct motivated by sexually discriminatory animus. That is not the test which this court must apply. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999) (district court appropriately refused to consider the defendant's attempt to disaggregate the various acts and endeavors forming the plaintiff's hostile work environment claim and cast doubt on each one, and properly evaluated the record as a whole). Instead, it must determine whether a reasonable factfinder could view the evidence as showing plaintiff's treatment was attributable to her sex. And the evidence need not establish a direct intent to discriminate, but merely must be capable of proving that the conduct in question was directed toward the plaintiff because of her sex. In making this evidentiary assessment, the court is not permitted to act as a factfinder and resolve the differing inferences that can be drawn from the evidence. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3d Cir. 2000). Instead, the evidence must be considered in the light most favorable to the non-movant, with all reasonable inferences being drawn in that

party's favor. Id. When viewed as a whole, plaintiff has failed to produce sufficient evidence to support the first prong of a hostile work environment claim.

There is no basis in the record to support a finding that the plaintiff's complaints concerning a co-worker in 2001 and defendant's response to those complaints constituted intentional discrimination directed at plaintiff because of her sex. At that time plaintiff worked on the sixty-four- inch pickle line, where coils of steel are welded into longer lengths, placed on a pass line, and put through a pickling process where scale and other impurities formed during the hot rolling process are removed. There are five work areas along the pass lines where the steel is processed: burner, heater, welder, shearman and bander/weighter. Each of these positions is performed at a different location along the pass lines and the burner, feeder and welder each perform their jobs in a small building in their respective work areas, commonly referred to as a shanty. Facing the pass lines, the burner shanty is on the far right (west), the feeder shanty is in the middle (approximately ten to fifteen feet to the left (east) of the burner shanty) and the welder shanty is approximately twenty to thirty feet to the left (east) of the feeder shanty. The feeder and welder shanties are at ground level and the burner shanty is elevated approximately three feet above the ground.

The burner shanty is approximately six feet wide, six feet long and eight feet high with windows on three sides and a door on the front. Inside are a chair, a small table and some tools. The work performed at this station is performed outside the shanty. The feeder shanty is larger and houses a panel of controls that the feeder uses to perform various operations on the pass line, including loading the coil onto a mandrel and cutting damage from the coil to ensure it has an expandable square end. The feeder shanty has large windows at the south end facing the pass lines, a door and a chair. Some of the work performed at this station is performed by remote control and the worker primarily remains within the shanty while performing the work.

Closed-circuit cameras are positioned at various points along the pickle line. These cameras transmit various images of the process to television monitors located in both the feeder

12

and welder shanties and enable the workers therein to observe the coils at various points along the pickle line. Different views of different locations can be observed by changing channels on the monitor. In addition, the cameras can be manipulated by joystick controls in the feeder and welder shanties. Thus, the feeder and welder can change the direction of each camera left to right and up and down, and focus and zoom in or out on any particular viewing area.

The burner shanty has no controls with which to operate the cameras, nor does it have a monitor to view the camera transmissions. Thus, if a camera is pointed in the burner's direction and an image of the burner displayed upon either television monitor, the burner would be oblivious to the fact that his or her image was being viewed through the camera system.

In 2001, plaintiff became the successful bidder for a position of operator on the sixty-four inch pickle line and commenced work as a "feeder" on September 24, 2001.[2] While working on the sixty-four inch pickle line, plaintiff observed a co-worker, Butch Patterson ("Patterson"), urinate in and around his work station. Patterson was the burner and performed his duties in and around the burner shanty. Patterson exposed his penis while urinating in or around his work site. On a few occasions plaintiff was walking through her shanty and looked in the direction of the burner shanty while attempting to get to the number one pass line controls. On these occasions plaintiff observed Patterson outside his shanty urinating in the dirt. On other occasions plaintiff observed Patterson urinating on the pass line or outside the shanty through images on the closed-circuit camera system. Plaintiff witnessed Patterson urinating inside his burner shanty on two occasion and witnessed him urinating outside his shanty on several occasions.

Plaintiff reported Patterson's behavior to her immediate supervisor, Ramo Lord ("Lord"). She also reported the conduct to vicing foreman Tom Williams and managerial employees Donald Robinson and Bill Hoffman. After first reporting these incidents, plaintiff would indicate

[2]Plaintiff signed a document on September 27, 2001, verifying that she was the successful bidder for the feeder job. At her deposition, plaintiff indicated that she actually performed the job prior to this date. Defendant's records do not show her working in the feeder position prior to September 24, 2001.

that Patterson was "exposing himself again" and she identified the conduct as "gross and disgusting."

It is undisputed that Patterson was never aware that plaintiff was observing him urinate in or around his work site. Patterson was unaware that plaintiff witnessed him directly or through the closed-circuit camera system. Patterson never purposefully exposed his penis to plaintiff.

On October 10, 2001, vicing foreman Williams observed Patterson urinating on the dirt floor behind a stack of coils several hundred feet from Patterson's work area. Williams reported the incident to Robinson. Patterson was not generally visible at his work site and Williams observed the behavior only because he walked over into that area on his way out of the plant. Later that day, Robinson confronted Patterson about the incident and directed him to refrain from urinating any where other than in a designated restroom. Patterson indicated he understood the directive and that he would comply. A few days later Robinson reiterated the directive and indicated Patterson's conduct was unacceptable. On both occasions Robinson warned Patterson that if his conduct continued, he would face significant discipline, including discharge.

During the next week, plaintiff observed Patterson urinating at the burner shanty and reported it to Lord, who was process leader for the sixty-four inch pickle line and raw coil storage area. Plaintiff observed Patterson urinating by looking out the window of her shanty that faced the burner shanty and by viewing him on the closed-circuit television monitor. Patterson did nothing to draw plaintiff's attention to him and gave no indication that he knew plaintiff was looking at him. Lord questioned Patterson about whether he had been urinating in his work area. Patterson denied that he had and assured Lord that he knew that doing so was inappropriate. Over the next few days plaintiff reported to Lord that she had witnessed Patterson urinating "a couple of times."

Plaintiff and Patterson worked the midnight shift from eleven p.m. to seven a.m. during the time in question. During the shift from eleven p.m. on Tuesday, October 16 to seven a.m. on Wednesday, October 17, 2001, plaintiff witnessed Patterson urinating inside his burner shanty

14

into a can and informed Lord of the conduct. That shift was Lord's last scheduled day of employment with defendant. When asked, plaintiff indicated she had witnessed Patterson through the closed-circuit camera positioned along the pass line. Upon questioning, Patterson denied that he had engaged in such behavior. Lord informed his relief, Bill Hoffman, process coordinator for the sixty-four inch pickle line, of plaintiff's allegations regarding Patterson.

During a morning production meeting on October 17, 2001, Robinson learned that employees on the daylight shift were unwilling to enter a particular work area because they had been informed that Patterson had been emptying a can believed to contain urine into the work area in question. At the same time, plaintiff contacted Robin Burke, who was responsible for industrial hygiene at the plant, and reported that Patterson had been urinating in his work area. Burke met plaintiff at the feeder shanty and plaintiff walked with Burke to the area by the pass line where Patterson had been urinating. Burke assured plaintiff that she would have the area cleaned.

After hearing the allegations on the morning of October 17, 2001, Robinson issued two disciplinary notices to Patterson for insubordination and urinating at his work site, imposing a five day suspension subject to discharge for each infraction. Patterson never returned to work after he left his shift on the morning of October 17, 2001. Following a hearing, both discipline notices were
converted to suspensions to discharge. Patterson filed a grievance which was denied and defendant's decision to discharge Patterson was upheld in binding arbitration.

Plaintiff never referred to Patterson's conduct in a manner that suggested she perceived it as sexual harassment. She never indicated to any management employee that she believed she was being sexually harassed or felt that the conduct was being directed at her because of her gender. She consistently identified the conduct as "gross and disgusting," and indicated it was a hygiene problem. Plaintiff did claim at her deposition that she spoke to a union member of the joint civil rights committee about the conduct, but could not remember the person she contacted.

15

Plaintiff explained that this individual indicated he would talk to Patterson, but plaintiff never followed up after the contact. No union representative of the joint civil rights committee ever reported the conduct to the staff supervisor of employee relations at the plant, who was in charge of investigating claims of discrimination and harassment for defendant.[3]

Plaintiff essentially concedes that she never described Patterson's urination as sexual harassment or identified it with terminology suggesting that it was being perceived in such a manner. Plaintiff did identify the conduct as gross and disgusting and indicated on several occasions that Patterson was "exposing himself" again. In response to defendant's motion, plaintiff notes that no special words are required to make a claim of sexual harassment under defendant's harassment policy and Patterson's inappropriate urination resulted in plaintiff seeing his penis in the workplace.    While plaintiff consistently characterizes Patterson's behavior as "exposing himself in the workplace" and contends that his conduct constituted a display of sexually harassing conduct, the record unequivocally demonstrates that Patterson's conduct was not directed at plaintiff because of her gender.   Patterson never knew that plaintiff was observing him urinating  in and around his work site and never intentionally directed any aspect of his conduct in a manner designed to attract plaintiff's attention or fall within her visual perception. In fact, the evidence consistently and only demonstrates that Patterson was attempting to hide his improper and unauthorized urination from detection by anyone.  The fact that plaintiff periodically witnessed it after she transferred onto the sixty-four inch pickle line on midnight shift does not convert Patterson's inappropriate urination  into conduct directed at plaintiff because of her gender.

Title VII is not a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998). And "while sexually overtones are not necessary to show discrimination because of the plaintiff's sex, the offending conduct must nonetheless be motivated by a plaintiff's sex or

---

[3]Plaintiff also claimed that she filed a charge regarding the matter with the EEOC, but could not remember and did not know what happened to the charge.

gender." Durham Life, 66 F.3d at 148. Patterson's conduct was indisputably devoid of any such motivation. Consequently, Patterson's conduct cannot be construed as conduct designed to permeate the workplace with discriminatory intimidation, ridicule and insult amounting to intentional discrimination directed at plaintiff because of her gender.

Furthermore, plaintiff's complaints concerning Patterson's conduct did not place defendant on actual or constructive notice of co-worker harassment occurring in the workplace. Plaintiff admits that she never referred to Patterson's conduct as a form of sexual harassment, which eliminates any basis for actual notice. See Kunin v. Sears Roebuck & Co., 175 F.3d 289, 294 (3d Cir. 1999) (actual notice requires a straightforward indication that a co-worker is harassing the plaintiff). And "courts have found that when employees' complaints do not refer to *sexually* offensive behavior, employers are not on constructive notice of sexual harassment." Id. (collecting cases in support) (emphasis in original). Merely identifying "gross and disgusting" conduct that was a form of improper personal hygiene did not place defendant on notice that plaintiff was being subjected to intentional harassment because of her sex. Compare Aman, 85 F.3d at 1083 (although actions need not have sexual overtones to constitute impermissible harassment, there must be "a showing that [gender] is a substantial factor in the harassment, and that if the plaintiff had been [male] she would not have been treated in the same manner" in order to constitute or provide notice of unlawful discrimination in the workplace); Whitaker v. Mercer County, 65 F. Supp.2d, 230, 244 (D. N.J. 1999) (complaints of conduct that are not sexual in nature do not without more suffice to establish constructive notice of hostile sexual harassment); Anderson v. Deluxe Homes of PA, Inc., 131 F. Supp.2d 637, 653 (M.D. Pa. 2001) (same).

Ten months prior to Patterson's discharge on October 17, 2001, plaintiff signed a bid for a position in the roll shop. One month after Patterson's last day of work, plaintiff accepted the bid to transfer to the roll shop on November 26, 2001. She began a new position as crane operator/roll builder in the roll shop on December 3, 2001. Plaintiff asserts that she decided to accept the bid on November 26, 2001, as a result of defendant's failure to act on her numerous

17

complaints concerning Patterson's conduct.[4]

Plaintiff's duties in her new position included operating an overhead crane used to load rolls of steel onto waiting tractor-trailers and performing various activities involving the maintenance and transportation of rolls of steel in the cold mill. Plaintiff came under the supervision of several managers in her new position, including Stanislaw Wojtunic, the process leader of the roll shop; cold mill processor leaders Harry Rutherford, Jason Murphy, and Chuck Lawson; and vicing foreman John Trainer. The process leaders reported to senior process leader Scott Buckiso. Typically, five bargaining unit employees would be present in the roll shop on any particular shift; two grinders, two crane operators/roll handlers; and a blaster. The grinder was responsible for operating equipment to assure a defect-free surface on the roll of steel being processed. The blaster used equipment to create a specified surface of roughness on the roll. The crane operator/roll handler, removed the chocks from the roll (which are used to keep the roll in place as it moves through the various processing locations) and placed the chock back on the roll after it had been refurbished. This employee also moved the rolls around within the roll shop using an overhead crane. At the end of the refurbishing process, most of the rolls were sent to an outside vendor, Chrome Deposit, for additional attention. The crane operator loaded and unloaded rolls from the Chrome Deposit truck.

Wojtunik recalled giving plaintiff and a coworker, Thomas Bedner, who worked as the grinder, a verbal warning on June 14, 2002, on the ground that each employee did insufficient work during the shift. Plaintiff could not remember receiving such a verbal warning nor could she recall who her supervisor was at the time.

Plaintiff and a fellow employee, John Coop, were working as crane operators on the back turn on August 28, 2002. While the two were eating lunch vicing foreman Trainer approached them about a Chrome Deposit truck, which Trainer believed had been waiting for over an hour to

---

[4]Patterson had not been in the workplace for more then five weeks when plaintiff decided to accept the bid.

be unloaded. Trainer directed both plaintiff and Coop to unload the truck after lunch. Plaintiff informed Trainer that she was ill, and he instructed her to go to the restroom until she could return to work. Plaintiff finished her lunch and went to the restroom. One and a half hours later, Trainer returned to the roll shop and recalled seeing plaintiff and Coop performing another job while the Chrome Deposit truck was still waiting to be unloaded. Trainer directed plaintiff and Coop to stop what they were doing and unload the Chrome truck immediately because the job required two workers. Plaintiff and Coop complied. Trainer advised Wojtunic of the situation and on August 29, 2002, Wojtunic issued written warnings to plaintiff and Coop for unsatisfactory work performance relating to their failure to unload the Chrome Deposit truck as directed.

Plaintiff's recollection of the above event is that Trainer directed her to go to the restroom because she was sick and she elected to do so. Apparently, plaintiff remained in the restroom for one and a half hours and was not on the scene when Trainer returned and directed that the Chrome Deposit truck be unloaded. Trainer did not recall plaintiff advising that she was ill or directing her to go to the restroom and remain there until she felt better.

Both plaintiff and Coop received a warning from Wojtunic on August 29, 2002. Neither employee lost any time from work or pay as a result of the warning. Both plaintiff and Coop filed a grievance over the warning. Plaintiff's grievance did not reference any discriminatory or harassing basis for the grievance. Both grievances were denied. During the grievance process plaintiff claimed that she was ill during her shift on August 28, 2001; and that was the reason for her failure to complete the work Trainer directed her and Coop to perform.

On September 4, 2002, plaintiff and Coop jointly filed a grievance on the ground that each had been "forced and scheduled" to work overtime. The two also jointly filed a grievance claiming each was constantly harassed by management, in that managers were "yelling, swearing and making accusations without knowing what is going on about employees (sic) work performance." Plaintiff subsequently indicated that "making accusations" referred to the August

19

29, 2001, written warning, but further testified that the grievance did not involve any conduct by Wojtunic or Buckiso. Plaintiff claimed that Trainer and Murphy cursed and used the "F" word when they were upset with her. In addition, Trainer pointed his index finger in plaintiff's face and yelled and screamed at her. Neither Trainer nor Murphy used any language specifically referring to or demeaning women. Nor did Trainer or Murphy refer to plaintiff's gender in the process of cursing, yelling or screaming at her.

The conduct underlying plaintiff's grievances on September 4 and 5, 2002, fails to raise any direct or inferential connotation that it was intentionally directed at plaintiff because of her gender. Both plaintiff and her male co-worker, Coop, received warnings on August 29, 2002, from Wojtunic, for unsatisfactory work performance. Each warning was based on reports of vicing foreman Trainer. Both plaintiff and Coop filed grievances over the written warnings. Similarly, the grievance filed on September 4, 2002 indicated that both plaintiff and Coop were being "forced and scheduled" to work overtime and were consistently subjected to swearing, yelling and being accused of improper work performance without sufficient investigation. The grievances were based on the use of foul language, index-finger pointing and general treatment that both plaintiff and Coop were receiving from vicing foremen Trainer and Murphy.

"Title VII is not a shield against harsh treatment in the workplace; it protects only in instances of harshness disparately distributed." Jackson v. City of Killeen, 64 F.2d 1181, 1186 (5 th Cir. 1981). In this regard, allegedly harassing conduct that is motivated by a bad working relationship, by a belief that the plaintiff has in some way acted improper, or even by personal animosity is not actionable under Title VII." See Koschoff v. Henderson, 109 F. Supp.2d, 332, 345-46 (E.D. Pa. 2000); Oncale, 523 U.S. at 81 ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination ... because of ... sex.").

The conduct in question was directed at both a male and female employee simultaneously without distinction between the two, and no aspect of these series of events suggests that plaintiff was singled out for special or different treatment because of her gender. A finding to the

20

contrary would be based on nothing more than pure speculation and conjecture.

Plaintiff's grievance protesting the lack of restroom facilities for women in her immediate work area suffers from similar infirmities. At the time, plaintiff was the only female employed in the roll shop. Plaintiff had access to several women's restrooms in the cold mill, which were located within one hundred feet from her work area. There were men's restrooms within thirty feet of plaintiff's work area and in the manager's office. Plaintiff frequently elected to walk approximately three hundred feet to a restroom in the women's locker room. Plaintiff used that restroom because of safety concerns about using the restroom in the manager's office during the night shift.

Plaintiff filed a grievance protesting the lack of restroom facilities for women in her immediate work area. The grievance was denied. During the grievance process defendant's management repeatedly expressed their dissatisfaction with employees in the cold mill, including plaintiff, taking numerous long breaks in the restroom, sometimes consuming as much as an hour or two. Plaintiff admitted it only took her a few minutes to walk the three hundred feet to the women's restroom in the locker room and sometimes she drove to the location on a forklift, which would only take a minute or so. Plaintiff subsequently admitted that using the women's restrooms in the cold mill within one hundred feet from her work area was a satisfactory solution, except on limited occasions when she needed access to her own locker during a restroom break.

The length of all roll shop employees' breaks became a focus point of management over several months. During this time, Murphy talked to plaintiff about taking too long of a break. He recalled leaving and then coming back about an hour later and discovering that plaintiff was still sitting in the break room and had not completed a pending work assignment. Murphy directed plaintiff to shorten her breaks. No formal discipline was issued over the matter.

Buckiso began to question plaintiff about her restroom usage. Plaintiff recollects that the questioning occurred "probably every other day" for approximately two months. During this time Buckiso asked Wojtunic if he had prevented plaintiff from using the restroom or questioned

21

her about going to the restroom. Buckiso told the plaintiff to use the restroom whenever she needed, but could not recall receiving any information indicating that plaintiff needed additional time to use the restroom. Buckiso found it unacceptable for any employee to be gone for over an hour or more under the guise of a restroom break. Management instructed plaintiff's immediate process leader, Harry Rutherford, to make sure plaintiff had adequate time to use the restroom and reiterated that she had permission to leave her work area to use the facilities either in the cold mill or the women's locker room. During this time Trainer, Wojtunic and Buckiso were unaware of the events on the sixty-four inch pickle line involving Patterson or that plaintiff had made any complaints about Patterson while she was working on that pickle line.

The events underlying plaintiff's grievance concerning the lack of a women's restroom in the roll shop fail to raise any basis to infer that plaintiff was subjected to intentional discrimination because of her gender. Plaintiff admits that management had a genuine concern about long restroom breaks by all employees within the cold mill, including plaintiff. The undisputed evidence demonstrates that plaintiff had reasonable access to a women's restroom while working at the roll shop and was not singled out for special treatment because of her gender. The fact that Buckiso questioned plaintiff about the amount of break time she was using does not demonstrate that plaintiff was treated differently because of her gender. Management was concerned about the length of breaks by all employees within the cold mill and plaintiff's supervisors were directed to assure that plaintiff received adequate time to use the restroom facilities located outside the roll shop. Questioning plaintiff based on a belief that she was improperly using too much time in the restroom is not sexual harassment. Koschoff, 109 F. Supp. 2d at 345-46. Furthermore, there simply is no evidence to support a finding that plaintiff was singled out for special treatment because of her gender with regard to restroom breaks or the length of time cold mill employees where consuming during restroom breaks.

The final series of events underlying plaintiff's complaint occurred in December of 2003 when she was docked in pay for reporting to work late. Employees at defendant's Irvin Plant are

22

given a card that has a magnetic strip on the back. The employees swipe the card at the gate, which operates like a time clock because the time is recorded in a computer system. Employees can be docked in two ways. First, if an employee swipes in at the gate after the designated start time, the employee will be automatically docked, subject to approval by a manager. Second, a shift manager can dock the pay of an employee who timely reported to work at the gate but failed to arrive at the work site after the start of the shift.

In December of 2003, Murphy was a process leader at the cold mill. At times he worked the back turn and would then have responsibility for the roll shop where plaintiff worked. On at least three occasions in December of 2003 Murphy docked plaintiff's pay for the number of minutes she was late in reporting to the work site. On at least one of these occasions, plaintiff showed Murphy a print-out sheet and Murphy contacted the foreman and reversed the docking, thereby adjusting plaintiff's pay.

Plaintiff contends that she was held to higher standards than her male counterparts, Chris Giles and possibly another male employee who worked in her area. Plaintiff could not identify the name of the other male employee nor the position he held in the roll shop, nor could she identify any other males which she believes were treated more favorably. Plaintiff's recollection is that in December of 2003, Giles and the other male co-worker reported late to the work site. Plaintiff was unaware of any discipline being imposed against these male employees on these occasions.

Plaintiff admits that she has no knowledge as to whether the male employees might have been in the work area prior to her arrival and were simply returning to the work site after she arrived. She did not see the male employees clock in at the gate after her. Murphy has spoken to other male employees about tardiness and has docked the pay of male employees who report late to their work site. Murphy docked the pay of Chris Giles for tardiness on two occasions in December of 2003.

Plaintiff's observing two male employees possibly reporting late to the work site during

23

December of 2003 does not provide competent evidence to support a finding that she was subjected to intentional discrimination because of her sex. Giles was disciplined for tardiness on two occasions in December of 2003 and plaintiff was unable to identify any other specific employee with which to make a comparison. Plaintiff's subjective belief that other male employees were not subjected to warnings and discipline when they were late to either the plant or the work site cannot create a material issue of fact where defendant's records conclusively show that male employees were subjected to similar treatment during the time in question.[5] Consequently, these series of events likewise provide no basis to support an inference that plaintiff was singled out for intentional discrimination because of her gender.

Collectively, the various strands of evidence plaintiff seeks to weave together in support of her hostile work environment claim carry no additional probative value. There remains no basis to conclude that plaintiff can establish by a preponderance of the evidence that she was subjected to intentional discrimination because of her sex. In each event, the evidence demonstrates that plaintiff was not held to high standards than her male counterparts and they were subjected to the same type of treatment of which plaintiff complains.

Plaintiff bears the burden of producing competent evidence to demonstrate that each of the elements of her hostile work environment claim can be resolved in her favor by a preponderance of the evidence. The circumstances underlying each  and all of the series of events identified by plaintiff in support of her hostile work environment claim are bereft of any evidence creating an inference of disparate treatment based on gender. This failure of sufficient evidence is in itself an adequate basis upon which to grant defendant's motion for summary judgement on plaintiff's hostile work environment claims.

But even assuming that the above analysis is flawed, plaintiff likewise has failed to produce sufficient evidence to support a finding that the conduct of which she complains can be

---

[5] This is particularly so where plaintiff cannot identify who the other employees were, thereby precluding any objective verification or evaluation of her allegation.

construed by the finder of fact to be hostile or offensive from an objective perspective. Title VII is violated only where harassment becomes "sufficiently sever or pervasive to alter the conditions of employment and create an abusive work environment." Meritor, 477 U.S. at 67. Conduct which amounts to the "ordinary tribulations of the workplace" such as sporadic use of abusive language, off-handed jokes and occasional taunting and teasing is beyond the purview of Title VII. Faragher v. City of Boca Raton, 524 U.S. 755, 788 (1998). Conduct becomes actionable only where it is perpetrated because of a protected trait and has become sufficiently "extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788.

In ascertaining whether the level of severity and pervasiveness needed to find a hostile environment is present, "it is settled law that courts [are not to] consider each incident of harassment in isolation." Durham Life, 166 F.3d at 155 (citing Andrews, 895 F.2d at 1484). Instead, the sum total of the abusive or offensive conduct must be evaluated. Id. This includes an analysis of "the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment." Cardenas, 269 F.3d at 261. This is the only approach consistent with the repeated directives of the Supreme Court that a hostile work environment claim is to be evaluated under a totality of the circumstances approach and in a manner that focuses on the existing "environment" in question. Jackson, 191 F.3d at 660 (citing Andrews, 895 F.2d at 1484 in support) ("[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")); Abramson, 260 F.3d at 279 ("no one event alone stands out from the rest, but all the events could be found to aggregate to create an environment hostile to a person of Abramson's religion.").

"Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity.'" Andrews, 895 F.2d at 1484 (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987)). And "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." Ellison v. Brady,

924 F.2d 872, 878 (9th Cir. 1991); <u>Wanchik v. Great Lakes Health Plan, Inc.</u>, 6 Fed. Appx. 252, 263 (6th Cir. 2001) (same).  At base, the severity and pervasiveness evaluation is "quintessentially a question of fact." <u>O'Shea v. Yellow Tech. Servs., Inc.</u>, 185 F.3d 1093, 1098 (10th Cir. 1999) (citations omitted).

The record fails to contain sufficient evidence to support a determination by the fact finder that plaintiff was subjected to an objectively hostile or abusive environment that altered the conditions of her employment.  To the extent plaintiff's evidence is accepted by the finder of fact, it reflects nothing more than a few unpleasant incidents that plaintiff found to be offensive or unjustified based upon her recollection.  But such subjective perceptions of the work environment fall far short of producing competent evidence that the workplace was permeated with hostility toward plaintiff to the point where it became objectively hostile.  <u>See</u> <u>Robinson</u>, 120 F.3d at 1300 (it is well-settled "that 'not everything that makes an employee unhappy' qualifies as [a materially adverse employment action], for otherwise, minor and even trivial employment action that 'an irritable, chip-on-the-shoulder employee did not like would form the basis for a discrimination suit.'") (quoting <u>Smart v. Ball State University</u>, 89 F.3d 431, 437 (7th Cir. 1996)).  In this regard "unsubstantiated oral reprimands" "unnecessary derogatory comments" and other minor negative treatment by the employer does not rise to the level of an employment practice that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." <u>Storey v. Burns International Security Services</u>, 390 F.3d 760, 764 (3d Cir. 2004) (quoting <u>Cardemas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001)); <u>Faragher</u>, 524 U.S. at 788 (the standards for judging hostility are designed to assure that "the ordinary tribulations of the workplace" are not substituted for the "extreme" conduct needed "to amount to a change in the terms and conditions in employment.").  In other words, a hand full of isolated incidents involving improper urination, unfounded discipline taken against male and female employees, yelling, swearing and finger-pointing against male and female employees, and the more distant physical locations of restrooms for females in the physical layout of the

plant fall far short of providing competent evidence that the work environment was permeated with extreme conduct that amounted to a change in the terms and conditions of plaintiff's employment. It follows that defendant is entitled to summary judgement on plaintiff's hostile work environment claim for this reason as well.

The record also lacks sufficient evidence to support findings in plaintiff's favor on her retaliation claims. Plaintiff essentially contends that she was held to higher standards and subjected to disparate treatment as a result of her complaints about Patterson's conduct.

In order to establish a prima facia case of retaliation under Title VII, a plaintiff must demonstrate that (1) he or she engaged in protected activity; (2) the employer took adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). A claim for retaliation under Title VII is evaluated pursuant to the McDonnell Douglas and Burdine burden-shifting analysis.

Defendant challenges plaintiff's allegations of retaliation on the ground that she cannot show any causal connection between any asserted protected activity and any alleged adverse employment action. Specifically, defendant contends that plaintiff has failed to produce any evidence that her supervisors in the cold mill were aware that plaintiff had complained about Patterson's conduct on the pickle line. In addition, any inference of causation assertedly is sufficiently eliminated by the passage of time. Plaintiff maintains that the record shows a sufficient connection between her complaints about Patterson's conduct and the subsequent discipline she received while working in the cold mill.

Even assuming for the purposes of argument that plaintiff's complaints concerning Patterson's conduct rise to the level of protected activity within the meaning of Title VII, plaintiff's retaliation claims fail for at least two basic reasons. First, plaintiff has failed to demonstrate that defendant took adverse employment action after she complained about Patterson's conduct. Second, the record lacks a sufficient basis from which the finder of fact can

27

infer a causal link between plaintiff's complaints concerning Patterson's conduct and the subsequent events in the cold mill of which she complains.

Title VII makes it an unlawful employment practice to discriminate against an employee because the employee has made a charge of discrimination. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997); 42 U.S.C. § 2000e-3(a). Unlawful employment practices under Title VII include discharging, refusing to hire or "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... or to limit, segregate, or classify ... employees ... in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's gender ...." 42 U.S.C. § 2000e-2(a). Thus, discriminatory conduct other than discharge or refusal to hire is prohibited by Title VII if it alters an employee's "compensation, terms, conditions or privileges of employment" or deprives the employee of "employment opportunities" or "adversely affects [the employee's] status as an employee." Robinson, 120 F.3d at 1300. Of course, "'not everything that makes an employee unhappy' qualifies as retaliation, for otherwise,'" even minor or trivial employment actions would form the basis for a claim of retaliation. Id. (quoting Smart v. Ball State University, 89 F.3d 437, 431 (7th Cir. 1996)).

The principle that retaliatory conduct must alter an employee's compensation, terms, conditions, or privileges of employment has been implemented through "the doctrinal requirement that the alleged retaliation constitute 'adverse employment action.'" Id. In this jurisdiction "the 'adverse employment action' element of a retaliation plaintiff's prima facia case incorporates the [ ] requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e-2(a) (1) or (2)." Id. Under this standard "unsubstantiated oral reprimands" "unnecessary derogatory comments" and other minor negative treatment by the employer does not rise to the level of a materially adverse employment action. Id. at 1301.

Plaintiff's evidence falls short of demonstrating that she was subjected to adverse

28

employment action in the cold mill. At best, she has demonstrated that she was subject to unsubstantiated reprimands, yelling and screaming and one or two pay dockings for tardiness that were not reversed upon her request. Such minor negative treatment by the employer simply fails to rise to the level of a materially adverse employment action.

Moreover, the record fails to contain sufficient evidence to support an affirmative finding on the causal element of plaintiff's retaliation claims. Where there is a temporal proximity between the protected activity and the adverse employment action, the requisite causal link may be inferred by the finder of fact. Woodson, 109 F.3d at 920. This is appropriate where the temporal relationship is in itself sufficiently suggestive. Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); Robinson, 120 F.3d at 1302. Where the temporal relationship is attenuated, a "time plus" other evidence is required. Farrell, 206 F.3d at 280. This "other" evidence may, but need not, take the form of an intervening pattern of antagonism or other evidence of retaliatory animus. Id. at 281. Proffering sufficient proof is not limited, however, to timing and demonstrative proof alone; instead, this element may be satisfied by "other evidence gleaned from the record as a whole from which causation can be inferred." Id

Plaintiff's evidence in support of the necessary causal link suffers from several shortcomings. First, plaintiff has failed to demonstrate that any of her managers or supervisors in the cold mill knew about her prior complaints regarding Patterson's conduct. Plaintiff acknowledged at her deposition that she did not know whether Wojtunic, Buckiso or Trainer had any knowledge of her prior complaints regarding Patterson's conduct. Each of plaintiff's supervisors has indicated under oath that he was unaware of the events involving Patterson or plaintiff's complaints pertaining to Patterson's conduct. Accordingly, the finder of fact's ability to infer that plaintiff's supervisors in the cold mill were motivated by retaliatory animus is non-existent.

Furthermore, the sporatic incidents of discipline and unpleasant treatment identified by plaintiff many months after Patterson was terminated and plaintiff transferred into the cold mill

29

are truly attenuated from her prior complaints concerning Patterson's conduct. The assertedly unfounded written warning on August 29, 2002, and her subsequent complaints concerning the lack of restroom facilities in her immediate work area occurred over ten months after the incidents leading to Patterson's termination and approximately nine months after plaintiff accepted the bid to transfer into the roll shop. The assertedly unfounded docking in pay for tardiness occurred two years after plaintiff registered complaints about Patterson's conduct. Under such circumstances the temporal relationship between the protected activity and the identified adverse employment action is sufficiently attenuated. And while plaintiff strenuously argues that an intervening pattern of antagonism or other evidence of retaliatory animus is present, the record falls far short of demonstrating either a "pattern" of antagonism or containing probative evidence of retaliatory animus. Consequently, defendant is entitled to summary judgment on plaintiff's claims of retaliation.

For the reasons set forth above, defendant's motion for summary judgment will be granted. An appropriate order will follow.

1-25-07

David Stewart Cercone
United States District Judge

cc:     Joel S. Sansone, Esquire
        Scanlon & Sansone
        2300 Lawyers Building
        Pittsburgh, PA 15219

        John W. Murtagh, Jr., Esquire
        110 Swinderman Road
        Wexford, PA 15090

        Mary Beth Taylor, Esquire
        United States Steel Corporation
        600 Grant Street
        Room 1500
        Pittsburgh, PA 15219-2800